(No. 54948.—

KAY CLEMENT *et al.*, Appellants, v. THE CHICAGO PARK DISTRICT *et al.*, Appellees.

*Opinion filed April 13, 1983.—Rehearing denied May 27, 1983.*

Calvin Sawyier, of Chicago, for appellants.

Joseph A. Power, of Chicago, for appellees.

James A. Geocaris, Ellen A. Fredel, and Albert F. Ettinger, of Chicago, for *amici curiae* Metropolitan Housing and Planning Council *et al.*

George E. Bullwinkel, of Chicago, for *amicus curiae* Open Lands Project.

Harris W. Fawell and Heidi H. Katz, of Fawell, James & Brooks, of Naperville, and Harry G. Finis, of Chicago, for *amicus curiae* Illinois Association of Park Districts.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs appealed from the order of the circuit court of Cook County dismissing their action for a declaratory judgment and injunctive relief against the defendants, the Chicago Park District and its commissioners, who are sued in both their individual and official capacities. The appellate court affirmed (95 Ill. App. 3d 824), and we allowed plaintiffs' petition for leave to appeal (87 Ill. 2d R. 315).

In their complaint plaintiffs alleged that they are citizens of the State of Illinois, residents of the city of Chicago, and taxpayers of the Chicago Park District. Plaintiffs alleged further that defendants deliberately and knowingly began and were continuing the unlawful construction of a golf driving range in Jackson Park in the city of Chicago, that such actions of defendants were contrary to the duties imposed upon them by law, that defendants were obligated to restore the site to its previous condition, and to reimburse the Chicago Park District the amount of costs to the park district for the construction and removal of the golf driving range.

The facts are adequately stated in the appellate court opinion and will be reviewed here only to the extent nec-

essary to discuss the issues. In 1978 the Chicago Park District designated approximately 11 acres of land located in Jackson Park in the city of Chicago for use as a golf driving range. On May 5, 1978, the park district submitted "An Application to the Chicago Plan Commission under the Lake Michigan and Chicago Lakefront Protection Ordinance" seeking approval for construction of the driving range. Without awaiting the approval of the plan commission the park district advertised for construction bids, awarded contracts, and publicly announced the project. The plan commission met on July 13, 1978, at which time one of the commissioners recommended that the plan commission accept the park district's application. The chairman of the plan commission expressed his personal view that a driving range was a proper park use and that the question whether change from one park use to another was appropriate was a problem for the park district commissioners, not the plan commission. At the plan commission's meeting of August 17, 1978, the park district moved to withdraw its application. The record indicates that on a vote by the plan commission the withdrawal request was approved. The record shows that it was understood that a legal opinion had been requested from the corporation counsel of the city of Chicago concerning the jurisdiction of the plan commission over the proposed project, and that if legal advice indicated that the plan commission had jurisdiction to rule on the driving range matter the question would be back before the plan commission. The record does not reflect that the corporation counsel submitted an opinion.

Plaintiffs sought a declaratory judgment that construction of the driving range was unlawful because of the park district's failure to receive prior approval from the plan commission pursuant to the lakefront protection ordinance (Chicago Municipal Code sec. 194B—1 *et seq.*),

and the entry of orders enjoining defendants from continuing with the project and directing defendants to restore the site to its previous condition and to reimburse the park district for the costs of the construction and removal of the driving range. The circuit court granted a preliminary injunction and ordered that the question whether under the lakefront protection ordinance the driving range could be constructed be referred to the Chicago plan commission. The plan commission failed to take any action in compliance with the court's order, apparently taking the position that because it was not a party to the suit and because no park district application was pending before it it was not bound by the order. Plaintiffs' motion to add the plan commission as a party was denied. Because plaintiffs failed to furnish a bond as required by the preliminary injunction order the injunction was dissolved. After a hearing the circuit court found that the driving range was a proper park function and that the park district commissioners did not exceed their powers or violate any of their duties and responsibilities in constructing the driving range. The court further found that the Chicago Park District was required to file an application with the Chicago plan commission in accordance with both section 11—12—4.1 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 11—12—4.1), and the Lake Michigan and Chicago Lakefront Protection Ordinance. (See Chicago Municipal Code sec. 194B—1 *et seq.*) The court stated that "with respect to this particular construction project and this particular case the approval of the Chicago Planning Commission is not necessary" and dismissed plaintiff's complaint. In its oral findings the court indicated that the Jackson Park area, having been designated a historical monument, was subject to the terms and conditions of the Chicago lakefront ordinance and that the plan commission was derelict in its duty in refusing to proceed and hear the mat-

ter with respect to the construction project. The court stated that based on its finding that the driving range was a proper park purpose it considered the approval of the plan commission useless and unnecessary.

In affirming the judgment the appellate court held that the defendant park district "exercises plenary and exclusive jurisdiction over its parks" (95 Ill. App. 3d 824, 832) and that although section 11—12—4.1 of the Illinois Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1) appeared to grant to the plan commission authority to approve any proposed construction project in a lakefront park, its negative report purporting to veto the project would be merely advisory. (95 Ill. App. 3d 824, 830.) It held, too, that the Lake Michigan and Chicago Lakefront Protection Ordinance (Chicago Municipal Code sec. 194B—1 *et seq.*) did not confer any greater veto power on the plan commission for the reason that under *City of Des Plaines v. Metropolitan Sanitary District* (1974), 59 Ill. 2d 29, "the subsequent acquisition of home-rule powers does not alter the legal relationship previously existing between a city and another governmental unit." (95 Ill. App. 3d 824, 834-35.) We note parenthetically that the decision in *Des Plaines* was based on *res judicata,* and we do not agree with the appellate court's interpretation of the holding.

The relevant portions of section 11—12—4.1 of the Illinois Municipal Code and the lakefront protection ordinance provide:

"Whenever a municipality of more than 500,000 population has created a plan commission pursuant to the provisions of this Division 12, every plan, design or other proposal by any public body or agency *** which changes the use of any real property owned or occupied by any public body or agency or the location of any improvement thereon within the territorial limits of the municipality, shall be referred to the plan commission *** to authorize such changes ***. *** A report that any such plan, de-

sign, or other proposal is not in conformity with the long range planning objectives of the municipality, or the official plan for the municipality *** shall not bar the public body or agency having jurisdiction over such real property or improvement thereon from thereafter making such changes ***." Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1.

"It shall be unlawful for any physical change, whether temporary or permanent, public or private, to be undertaken, including, but not limited to, *** construction of any kind, within the Lake Michigan and Chicago Lakefront Protection District, *** without first having secured the approval therefor from the Chicago Plan Commission ***." Chicago Municipal Code sec. 194B—5.1.

For the most part the briefs of the parties consist of contentions and arguments concerning the applicability of the lakefront protection ordinance and section 11—12—4.1 of the Illinois Municipal Code and which of them governs the decision of this appeal. In the posture of this case, and on this record, we need not and do not decide these questions. Both the circuit and appellate courts decided that the construction of the driving range was a proper park purpose, and we agree. Further, we agree with the appellate court that under the standards formulated in *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, the creation of the driving range did not constitute a violation of the public trust. See 95 Ill. App. 3d 824, 834.

Having concluded that the construction of the driving range was a proper park purpose it is apparent that if any impropriety occurred in connection with the project, it stemmed not from actions which exceeded the powers of the defendant commissioners and park district, but from an alleged failure to comply with the ordinances of the city of Chicago. The city of Chicago is not a party to this action, and plaintiffs do not assert that they have standing to act for the city. We know of no authority which gives these plaintiffs standing to seek an order requiring defendants who have taken action consistent with their statutory

powers to seek the approval of another governmental unit which has not itself asserted jurisdiction in the matter.

For the reasons stated the judgment is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

Many years ago, Daniel Burnham advised the Chicago city fathers: "Make no little plans." The court's decision dooms the city to shortsighted and parochial visions of the Chicago lakefront, much of which is bordered by city parks. Jackson Park, the subject of this litigation, was designed by Frederick Law Olmsted, recognized as the founder of American landscape architecture, in accordance with Burnham's directive. It is today one of the State's great urban natural resources, and it is imperiled by the court's decision. The majority's decision completely ignores the statutory scheme created by the State and the city to safeguard that resource. I fear that this can only result in the progressive loss of the park as Olmsted envisioned it, as well as the balkanization of the shores of Lake Michigan contrary to the grand vision of Burnham and the wishes of the people as expressed through the legislature and the Chicago city council.

Section 194B—5.1 of the Chicago Municipal Code (the Lakefront Protection Ordinance), adopted on October 24, 1973, requires all proposed physical changes within the Chicago Lakefront Protection District, including Jackson Park, to receive the approval of the Chicago plan commission. The basic issue in this case is the impact of that ordinance in light of a 1961 statute which effectively makes the approval of plan commissions merely advisory with respect to any "public body or agency" (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1), a 1933 statute which charges the Chicago Park District with management of the parks within that city (Ill. Rev. Stat. 1979, ch. 105, par. 333.1), a 1963 statute which permits municipalities to designate certain areas as having historical, community or aesthetic

value and to regulate such areas by ordinance (Ill. Rev. Stat. 1979, ch. 24, par. 11—48.2—2), and the grant of home rule powers to the city of Chicago by the 1970 Illinois Constitution (Ill. Const. 1970, art. VII, sec. 6(a)). The appellate court noted that there was a conflict between these directives and resolved it by reading the 1961 statute (the Inter-Agency Referral Act) as setting forth the controlling law. (95 Ill. App. 3d 824, 830.) The majority of this court appears to agree with this holding, its only statement on the matter, however, being that the propriety of the park district's action is established by the finding that a golf driving range is "a proper park purpose." (96 Ill. 2d at 30.) That is far too simplistic a resolution of a complex problem involving conflicting authorities; the only sensible reading of the various statutes, ordinances and constitutional provisions which have a bearing on the problem is that they require *approval* by the plan commission of any proposal for physical changes in Jackson Park. No approval was received here.

It is a basic tenet of statutory construction that, to give effect to the intent of the legislature, two statutes which relate to the same subject matter should be read *in pari materia* so far as it is possible to do so. (*Gillespie v. Riley Management Corp.* (1974), 59 Ill. 2d 211; *People ex rel. Scott v. Illinois Racing Board* (1973), 54 Ill. 2d 569.) Thus we must read the 1933 Chicago Park District Act and the Inter-Agency Referral Act, on which the park district relies, in harmony with the 1963 act and the municipal ordinances promulgated under its authority, rather than assuming without comment that the two earlier acts preempted the later one and left the city of Chicago no room to regulate or veto with respect to developments in lakefront parks. The 1933 act had the purpose of unifying management powers over Chicago parks that previously had been exercised by various park districts within the city and of vesting in the commissioners of the unified park dis-

trict the power to "exercise control over and supervise the operation of all parks, boulevards, ways and other public property now under the jurisdiction of any of said park districts" (Ill. Rev. Stat. 1979, ch. 105, par. 333.1), including the ability to acquire land for the parks, provide police for the parks, levy taxes and issue bonds (Ill. Rev. Stat. 1979, ch. 105, pars. 333.7, 333.15, 333.16, 333.20). Thirty years later, in the face of this grant, the legislature passed the 1963 act relating to preservation of historical and other special areas, including areas of "special historical, community, or aesthetic interest or value" (Ill. Rev. Stat. 1979, ch. 24, par. 11—48.2—1), pursuant to which Chicago's Lakefront Protection Ordinance was enacted. This act recognized in its statement of policy that "in all municipalities [there are] places *** having special historical, community, or aesthetic interest or value and whose preservation and continued utilization are necessary and desirable to *sound community planning* for such municipalities and to the welfare of the residents thereof. The granting to such *municipalities* of the powers herein provided is directed to such ends ***." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 24, par. 11—48.2—1.) It permitted municipalities "to provide for official landmark designation by ordinance of areas [or] places *** having a special historical, community, or aesthetic interest or value; and in connection with such areas [or] places *** *whether owned or controlled privately or by any public body,* to provide special conditions, to impose regulations governing construction, alteration *** and use, and to adopt other additional measures appropriate for their preservation, protection, enhancement [or] use ***." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 24, par. 11—48.2—2.) The 1963 act implicitly recognizes that municipalities, with their multifarious concerns, are often in a better position to undertake "sound community planning" in the interest of their citizens than are nonmunicipal bodies such as the Chicago Park District, whose concerns

and expertise are more narrowly focused on operations of the parks themselves than on the impact of those operations upon the preservation of the city as a whole. I read it as being the intent of the legislature that, at least with regard to the preservation of "historic, community or aesthetic" resources that are located wholly within the limits of a single municipality, cities and towns rather than nonmunicipal public bodies should have the final say.

The park district and the appellate court attempt to avoid this result by pointing to the statement in the Inter-Agency Referral Act that "[a] report [by a plan commission] that any *** plan, design, or other proposal [by a public body or agency] is not in conformity with the long range planning objectives of the municipality, or the official plan for the municipality *** shall not bar the public body or agency having jurisdiction over [the] real property or improvement thereon from thereafter making such changes ***." (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4.1.) I do not believe that this provision leads to the result urged by the park district. The 1963 act, from which I have quoted extensively and which authorized the Lakefront Protection Ordinance, was enacted two years *after* the Inter-Agency Referral Act, and it deals specifically with preservation of historic or aesthetic resources, while the Inter-Agency Referral Act deals only generally with plan commissions and long-range planning objectives, without regard to the type of goal that is sought to be furthered. My interpretation, that the 1963 act controls the Inter-Agency Referral Act where the two contrary provisions overlap, follows from two principles of law: First, the rule that "[w]here there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates only to one subject, the particular provision must prevail and must be treated as an exception to the general provision, especially where the particular provision is later in time of enact-

ment" (*Bowes v. City of Chicago* (1954), 3 Ill. 2d 175, 205; see also *Hah v. Stackler* (1978), 66 Ill. App. 3d 947, 953; *People v. Taylor* (1974), 18 Ill. App. 3d 480, 482); and second, the maxim that the legislature, in passing a statute at odds with preexisting law, is presumed to have understood the law and wished to avoid its strictures (*Kozak v. Retirement Board* (1983), 95 Ill. 2d 211, 215-16; *Heineman v. Hermann* (1943), 385 Ill. 191, 196; see, *e.g.*, 2A Sutherland, Statutory Construction sec. 51.03, at 299-300 (4th ed. 1973)). The contrary interpretation, advanced by the appellate court and not corrected by the majority of this court, impermissibly gives no effect to the later and more specific enactment.

I also believe that the Lakefront Protection Ordinance is given a sound foundation, independently of the 1963 statute, by the constitutional grant of home rule powers to the city of Chicago; this alternative reason should control this case, irrespective of the provisions of the Inter-Agency Referral Act. The 1970 Constitution vests home rule units with the power to "perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public *** welfare." (Ill. Const. 1970, art. VII, sec. 6(a).) It is not disputed that the ordinance at issue here comes within this power to regulate. Rather, the park district and the appellate court maintain that under *City of Des Plaines v. Metropolitan Sanitary District* (1974), 59 Ill. 2d 29, a city which otherwise lacks the power to regulate the activities of a State or regional commission does not succeed to such power with acquisition of home rule status. In that case a municipality was held unable to prohibit the operation of a water-reclamation plant by invoking its zoning powers. However, the sole rationale for this holding was *res judicata*, a defense obviously not available here. Nowhere was it intimated in that opinion that a municipality could never use its home rule powers to prohibit that which it was un-

able to regulate before it acquired those powers. The case most directly on point in this regard is *Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, in which this court unanimously held that the city of Peoria could impose a use tax on that city's park district under its home rule powers, despite the existence of a statute giving certain powers to park districts serving fewer than 500,000 people. In doing so, the court considered and rejected the contention that the statute evidenced "a pervasive statewide interest in parks and park districts which prohibits a home rule unit from legislating in such a manner as to impose incidental obligations and burdens upon park districts." (76 Ill. 2d 469, 477.) It appears to me that it is only where the commission or special district being regulated is regional in its operation, such as the Metropolitan Sanitary District, that individual home rule units within the region may be prevented from imposing obligations on it or regulating its activity. (*Metropolitan Sanitary District v. City of Des Plaines* (1976), 63 Ill. 2d 256.) That limitation does not apply in this case, as the operations of the Chicago Park District are wholly within the city of Chicago.

Because the Lakefront Protection Ordinance governs this case, I believe that the majority's simple statement that a driving range is a "proper park purpose" is a grossly inadequate response to plaintiffs' concerns. It may be that a driving range is usually a proper park purpose, but the question in this case is whether it is a proper activity in Jackson Park, given the concern the city has expressed in its ordinance for the integrity of its lakefront. It may be that the answer in this case should be in the affirmative, but that is for the Chicago plan commission, not the park district or this court, to decide. Were it otherwise, as the majority appears to have decided, the park district would be able to term virtually any development it wishes a "proper park purpose" without regard to the unique features of Jackson Park and our lakefront, merely by point-

ing to the fact that such developments have some recreational value and that they appear in other parks in Chicago and elsewhere. In this case the only criterion on which the park district seems clearly to have relied is the likelihood that a golf driving range that charges a fee will make money. However, making money from the use of lakefront park land may not be consistent with preservation of the lakefront for the use and enjoyment of all Chicago residents. Under this criterion a Coney Island-style amusement arcade would be at least as appropriate a "park purpose," yet it would be absurd to suggest that it is a suitable use for 11 choice acres of Jackson Park which are particularly suited and in recent years have been used for picnicking, strolling, bird watching, kite flying and other casual activities for which no fee was charged. I submit that the requirement that the plan commission approve such proposals for lakefront parks is a necessary way of insuring that land-use decisions affecting such parks take more than just the bottom line into account, and that this would probably be true even if its decision were merely advisory. The park district's decision to enter into construction contracts for the driving range first and then either present the plan commission with a *fait accompli* or bypass it altogether was an attempt to take the law into its own hands. The courts of this State have condemned such attempts many times, and we should do so here.

I do not understand the significance of the majority's brief statement that the plaintiffs lacked standing to bring this action, as it seems to have addressed the merits of the controversy anyway, but the statement puzzles me and should receive some response. While parties are generally not permitted to litigate where they have no "personal stake in the outcome of the controversy [so] as to assure that concrete adverseness which sharpens the presentation of issues" (*Baker v. Carr* (1962), 369 U.S. 186, 204, 7 L. Ed. 2d 663, 678, 82 S. Ct. 691, 703; see also *Warth v.*

*Seldin* (1975), 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197; *Flast v. Cohen* (1968), 392 U.S. 83, 20 L. Ed. 2d 947, 88 S. Ct. 1942), standing is generally found where the plaintiff alleges that he will suffer a personal injury if not given the relief he seeks (*e.g., Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827), even if that injury is solely to the plaintiff's sense of aesthetics (*Sierra Club v. Morton* (1972), 405 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361). In this case plaintiffs, who allege that they are users of Jackson Park, complain that the park district's unlawful refusal to submit a proposal to the Chicago plan commission for approval will result in an intrusive development in Jackson Park which will damage its aesthetic value and deprive them of reasonable access to 11 acres of otherwise public land. In short, they allege the existence of "statutes creating legal rights, the invasion of which creates standing" (*Linda R.S. v. Richard D.* (1973), 410 U.S. 614, 617 n.3, 35 L. Ed. 2d 536, 540 n.3, 93 S. Ct. 1146, 1148 n.3). I fail to see the relevance of the fact that the city of Chicago also has rights which were invaded by the park district's disregard for the law. As long as the plaintiffs' injury is concrete and flows directly from the conduct complained of, they may seek a remedy without relying on the city to act. Here the need for a remedy is even clearer, as the city has stood by silently while a once-beautiful meadow is blocked from public access by a 12-foot-high, steel chain-link fence topped by barbed wire.

Under the Lakefront Protection Ordinance, the people of Chicago charged the plan commission with the duties of conserving the priceless natural resource of Lake Michigan, its water and shoreline, promoting access to the shoreline and expanding the quality and quantity of the lakefront parks. In the face of this directive, the majority decision creates isolated pockets of the lakefront occupied by public parks which it cuts adrift from the comprehen-

sive planning the Lakefront Protection Ordinance was designed to provide. This result is an anomaly which this court should not have brought about.

The park district should not be treated as a sort of duchy separate from the city. The use and development of Chicago's lakefront parks, as well as the lakefront itself, should be subject to the will and desires of all the people of Chicago through the expression of their city council and plan commission.